# EXHIBIT A

## TO THE

# MOTION FOR LEAVE TO AMEND

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GILBERT RAMEZ CHAGOURY ) <br> 21 Bis Avenue D'Iena, ) <br> Paris, France 75116, ) <br> ) <br>       Plaintiff, ) <br> ) <br>   v. ) <br> ) <br> FEDERAL BUREAU OF INVESTIGATION ) <br> 935 Pennsylvania Avenue, NW ) <br> Washington, D.C. 20535-0001, ) <br> ) <br> DEPARTMENT OF JUSTICE ) <br> 950 Pennsylvania Avenue, NW ) <br> Washington, D.C. 20530-0001, ) <br> ) <br> NATIONAL COUNTER TERRORISM ) <br> CENTER ) <br> 1500 Tysons McLean Drive ) <br> McLean, VA 22102, ) <br> ) <br> DEPARTMENT OF STATE ) <br> 2201 C Street, NW ) <br> Washington, D.C. 20520, ) <br> ) <br> CENTRAL INTELLIGENCE AGENCY ) <br> 1000 Colonial Farm Road ) <br> McLean, VA 22101, ) <br> ) <br> DEPARTMENT OF HOMELAND SECURITY ) <br> 245 Murray Lane SW ) <br> Washington, D.C. 20528-0075, ) <br> ) <br> AND ) <br> ) <br> UNITED STATES CUSTOMS AND BORDER ) <br> PROTECTION ) <br> 1300 Pennsylvania Avenue. NW ) <br> Washington, D.C. 20229, ) <br> ) <br>       Defendants. ) <br> ) | Civil Case No.  16-cv-1844 (TSC) |

## SECOND AMENDED COMPLAINT

### Introduction

1.      Plaintiff Gilbert Ramez Chagoury ("Gilbert Chagoury") is a devout Catholic who

has dedicated much of his life to philanthropic works across the globe.  Born in Nigeria to

Lebanese parents, he is a British citizen who has worked for peace around the world and has devoted much of his life to the security and religious liberty of the Christians of the Middle East. He has been a lifelong supporter of the United States and of America's interests around the world.  He has a long history of philanthropy on behalf of many United States charities including, but by no means limited to, his substantial financial support of St. Jude Children's Research Hospital.

2.      An Ambassador to the Holy See, Gilbert Chagoury is a man of deep faith who abhors violence and works tirelessly for peace in his native Nigeria, his ancestral home of Lebanon, the Middle East, and the world.

3.      For many years, Gilbert Chagoury has maintained substantial ties to the United States, including interest in real property in California and maintaining financial accounts in the United States.  He frequently visited the United States for business and pleasure.

4.      Gilbert Chagoury also maintains strong relationships with family and friends that live in California.

5.      From 2000 until 2017, Gilbert Chagoury maintained a home in Beverly Hills, California, where he spent about two to three months each year.

6.      Notwithstanding this exceptional record of public service, demonstrated commitment to core American values such as religious freedom, and substantial ties to the United States, Gilbert Chagoury was denied a visa by the United States Department of State ("State Department").  Gilbert Chagoury believes that this decision was based on false information.

7.      On information and belief, the State Department, or possibly the Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), National Counter Terrorism Center

("NCTC"), Central Intelligence Agency ("CIA"), Department of Homeland Security ("DHS"), or the United States Customs and Border Protection ("CBP"), compounded this injustice by leaking information about the denial of Gilbert Chagoury's visa application and a prior incident in which he was for a time restricted in his air travel to the United States,[1] to Los Angeles Times ("LA Times") reporter Joe Tanfani, including the false information that reportedly led to the visa denial and Selectee or No Fly list classification, without seeking or obtaining Mr. Chagoury's consent, and without providing notice or an opportunity to be heard or to dispute the false information.

8.      Because Gilbert Chagoury is a successful businessman, influential advocate for religious freedom, philanthropist and a friend of prominent political leaders, the LA Times published the story in its newspaper under an inflammatory headline.

9.      The intentional leak to the media of false information improperly impugning the reputation of Gilbert Chagoury replicates and aggravates a similarly unlawful incident from 2010, when Gilbert Chagoury was, on information and belief, restricted in his air travel to the United States, without notice or opportunity to be heard, an action that was leaked to the media as his having been placed on the No Fly list.  The U.S. Government eventually issued an apology for the inconvenience this caused and allowed Gilbert Chagoury to travel to the United States, which he did multiple times without incident until quite recently.

10.     In his LA Times article, Joe Tanfani cites multiple Government sources.  More specifically, he cites:

---

[1] This was reported by the media as placement on the No Fly list.  The Government is in the best position to know whether Gilbert Chagoury has ever been on the No Fly list.   For the purposes of this Second Amended Complaint, all references to the leak of his presence on the No Fly list refer to this incident.

A.  A "Homeland Security document [that] shows agents citing unspecified suspicions of [Chagoury's] links to terrorism, which can include financing extremist organizations" at or around the time that Gilbert Chagoury was placed on the Selectee list in about 2010;

B.  "Homeland Security documents" that purportedly "show" that Gilbert Chagoury was "subsequently removed from the [no fly] list and categorized as a 'selectee'";[2]

C.  "A 2013 FBI intelligence report, citing unverified raw information from a source, claimed Chagoury had sent funds to [Gen. Michel] Aoun, who transferred money to Hezbollah.  The source said Aoun was 'facilitating fundraising for Hezbollah.'  The U.S. put Chagoury in its database used to screen travelers for possible links to terrorism, interagency memos show"; and

D.  Cites "interviews and government documents" for the fact that Gilbert Chagoury was denied a visitor's visa, reportedly "[b]ased upon the FBI report and other allegations from intelligence and law enforcement sources."

11.   Since none of the alleged "facts" described in Paragraphs 10(A)-10(D) should have or appear to have been in the public record at the time the article was published, Tanfani could only have had access to this information and these documents as a result of illegal leak(s) by a Government agent.  To take one example, the letter denying Gilbert Chagoury's visa application stated only that he was found ineligible according to Section 212(a)(3)(B) of the Immigration and Nationality Act; it did not cite any FBI report or alleged links to specific terrorist organizations.

---

[2] *See supra* at note 1.

12.    The "facts" described in Paragraphs 10(A) and 10(C) are false.  Gilbert Chagoury has no links to terrorism and has never provided any financial or any other support to Hezbollah or any other terrorist organization.

13.    These allegations purport to be based on Government documents and databases, suggesting that the Government is currently maintaining false and defamatory information concerning Gilbert Chagoury in its systems.

14.    The Government's intentional and outrageous leak of information and more importantly, misinformation about Gilbert Chagoury triggered the obvious, foreseeable, inevitable and ongoing consequence of making banking in the United States more difficult, bordering on impossible, depriving him of property interests in violation of his Constitutional right to due process.

15.    Based on the Government's history of leaking information about Gilbert Chagoury purporting to show his alleged terrorist ties, Gilbert Chagoury has a reasonable, good faith belief that he will continue to be the target of such leaks and that his inability to bank in the United States will continue indefinitely into the future.

16.    As a result of the Government's malfeasance, Gilbert Chagoury's reputation, business opportunities, and property interests protected by the Fifth Amendment to the United States Constitution have been harmed.  He therefore brings this action seeking a Court Order demanding the Government make a good faith effort to identify and discipline the agents responsible for the ongoing illegal leaks against him, to provide him an opportunity to clear his name, and to obtain the process he is due for the deprivation of his property rights.

17.    Gilbert Chagoury further brings this action because he has been deprived of a constitutionally-protected liberty interest – the right as a nonresident with substantial ties to the

United States to travel to this country – without due process.  Gilbert Chagoury has been deprived of this right by the Defendants' continued maintenance of false information in their databases, including, but not limited to, the allegations in Paragraphs 10(A) that he has links to terrorism and 10(C) that he sent funds to Aoun to be transferred to Hezbollah, which reportedly led directly to his visa revocation and subsequent visa denial, and creates an ongoing obstacle to his receiving a visa in the future.  He seeks a post-deprivation opportunity to be heard on the misinformation.

18.    The Constitution requires that Gilbert Chagoury be provided with a name-clearing hearing, at which he will have an opportunity to prove the Government is maintaining false information about his alleged terrorist ties and to restore his good name.

**Parties**

19.    Plaintiff, Gilbert Ramez Chagoury ("Gilbert Chagoury"), was born in Nigeria and is a British citizen.

20.    The Federal Bureau of Investigation ("FBI") is a component of the United States Department of Justice, a Department of the Executive Branch of the United States Government.

21.    The Department of Justice ("DOJ") is a Department of the Executive Branch of the United States Government and oversees the FBI.

22.    The National Counter Terrorism Center ("NCTC") is an agency of the Executive Branch of the United States Government.

23.    The Department of State ("State Department") is a Department of the Executive Branch of the United States Government and is responsible for the review of applications for visas to enter the United States.

24.    The Central Intelligence Agency ("CIA") is an agency of the Executive Branch of the United States Government.

25.    The Department of Homeland Security ("DHS") is a Department of the Executive Branch of the United States Government.

26.    The United States Customs and Border Protection ("CBP") is a component of DHS, a Department of the Executive Branch of the United States Government.

## Jurisdiction

27.    This action arises under the Fifth Amendment to the United States Constitution.

28.    This court has subject-matter jurisdiction over the claim arising under the Fifth Amendment pursuant to 28 U.S.C. §§ 1331 and the power to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202.  Venue is proper pursuant to 28 U.S.C. § 1391.

## Facts

29.    Gilbert Chagoury is a prominent businessman and a leading figure in the Maronite Catholic community.  He was born in Nigeria to Lebanese-Christian parents, is a British citizen, and currently resides in Paris.

30.    Gilbert Chagoury is Founder and Chairman of the Chagoury Group, an industrial conglomerate with assets exceeding $1 billion that employs thousands of people worldwide.  He is also Saint Lucia's Ambassador to UNESCO, to the United Nations Office at Geneva, and to the Holy See.

31.    Gilbert Chagoury is a private individual, who is best known for his business activities, advocacy for religious freedom and his philanthropy.

32.    Gilbert Chagoury is engaged in philanthropic activities across the globe, including in the United States.

33.    Gilbert Chagoury has funded the establishment of a medical school and a nursing school at the Lebanese American University.

34.    Gilbert Chagoury has been named Commander of Arts and Letters by the French Ministry of Culture for his contributions to the restoration of the Richelieu Aisle in the Musée du Louvre.  He has also donated a series of six seventeenth-century Beauvais tapestries and a pair of Sèvres vases to the Louvre, for which he has a gallery in his name.

35.    Gilbert Chagoury is an active supporter of health, education, and infrastructure projects elsewhere, and particularly in Mizyara, Lebanon.

36.    Gilbert Chagoury has donated millions of dollars to the Clinton Global Initiative.

37.    Gilbert Chagoury has funded scholarships and degree programs at multiple universities in the United States and has donated to the St. Jude Children's Research Hospital.

38.    As a result of these philanthropic activities, Gilbert Chagoury travels around the world, including to and within the United States.

39.    These activities are only part of the positive and mutually beneficial interactions that Gilbert Chagoury has long had with the United States.  As an important industrialist in Nigeria, he has assisted the U.S. Embassy there whenever possible, and U.S. Ambassadors often call him to help solve their problems.

40.    Gilbert Chagoury has previously held a U.S. visa and he has traveled to this country regularly.

41.    For more than a decade and until recently, Gilbert Chagoury maintained a residence in Beverly Hills.  He has been a dues-paying member of a local country club and is a dedicated fan of the Los Angeles Lakers.

42.   Gilbert Chagoury, until the events complained of herein, spent about two to three months each year in the United States, where he visited family members who live in the United States.

43.   In addition, in the course of his career, Gilbert Chagoury has developed friendships with many prominent Americans.  This group includes Government officials protected by the Department of Homeland Security's Secret Service, the Department of State's Bureau of Diplomatic Security, and similar agencies.  Gilbert Chagoury has been cleared by these security forces to attend events and socialize with many current and former high-ranking officials from multiple Presidential administrations including, but not limited to, President William J. Clinton.

### January 2010 No Fly List Incident

44.   On information and belief, in January 2010, Gilbert Chagoury was placed on the Selectee or No Fly list.

45.   Gilbert Chagoury was provided no notice or opportunity to be heard prior to being placed on the list.  He was simply informed that he could no longer travel to the United States.

46.   Almost immediately, on February 17, 2010, ABC News reported that Gilbert Chagoury had been placed on the No Fly list.

47.   The article, which was published on the World Wide Web, cited "law enforcement authorities" as the source of this information and reported that "law enforcement authorities say Chagoury was a 'positive match' to the Gilbert Chagoury on the terrorism no fly list."

48.   According to the ABC News article, "the no-fly list is designed to 'keep known terrorists off planes.'"

49.   Upon information and belief, the "law enforcement authorities" who were the source of the ABC News article were agents of the FBI.

50.     The ABC News report instigated a spate of additional stories that stigmatized Gilbert Chagoury based on his reported placement on the No Fly list for terrorists.

51.     The injuries to Gilbert Chagoury's reputation caused by the leak were exacerbated by the falsity of the misinformation leaked and the Government's refusal to disavow it.

52.     Gilbert Chagoury sought redress by filing a petition with DHS under its only available procedure, the Traveler Redress Inquiry Program and by preparing a lawsuit to rebut the wrongful allegations against him.

53.     As a result, the Government agreed to a modified selectee search protocol – allowing Gilbert Chagoury to again travel to the United States – and issued a letter of apology. Gilbert Chagoury's reported removal from the No Fly list and the Government's apology received significant media coverage.  And, subsequent reports that have mentioned the No Fly List Incident, including the LA Times Article, typically include reference to the Government's apology.

54.     Gilbert Chagoury has traveled to the United States multiple times without incident since the 2010 No Fly List Incident.

## 2015 Visa Application

55.     Gilbert Chagoury has traveled regularly to the United States for over 35 years on ten year multiple-entry tourist visas.  The last visa was issued in December 2006.

56.     On May 22, 2015, the State Department revoked Gilbert Chagoury's visa and required him to reapply, which he did.

57.     The State Department then denied Gilbert Chagoury's application for a visa in September 2015, citing the Immigration and Nationality Act ("INA") Section 212(a)(3)(b).

58.     Being denied a visa pursuant to INA Section 212(a)(3)(b) indicates that the State Department wrongly believed Gilbert Chagoury has provided material assistance to terrorism.

59.     In fact, Gilbert Chagoury has not provided material assistance to any terrorist group and there is no reasonable basis on which to believe he is a terrorist threat.

60.     On information and belief, the State Department believed Gilbert Chagoury provided material support to terrorists because of misinformation provided to it by the FBI, DOJ, NCTC, CIA, DHS, or CBP.

61.     As recited in Paragraphs 10(A) and 10(C), the LA Times article cites several false and defamatory "facts" as coming from government documents and databases and providing the basis for the visa denial, including alleged "links to terrorism" and "claim[s] Chagoury had sent funds to Aoun, who transferred money to Hezbollah."

62.     On information and belief, the Government continues to maintain these false allegations in its databases and its continued maintenance of this misinformation in its databases makes it a virtual certainty that Gilbert Chagoury will not be able to receive a visa to enter the United States for the foreseeable future.

63.     Gilbert Chagoury has a right to be free from being falsely stigmatized as an individual associated with terrorist activity, where, as here, the stigma caused a change in legal status that affects his ability to travel to this country, a liberty interest protected under the due process clause of the Fifth Amendment.  Such process should consist, at a minimum, of a post-deprivation hearing allowing him to prove the falsity of the Government's erroneous records.

### Disclosure to LA Times

64.     Beginning in June 2016, Gilbert Chagoury and his spokesperson received repeated communications from Joe Tanfani, a reporter at the LA Times, asking for details regarding the denial of Gilbert Chagoury's visa application.

65.     On August 28, 2016, the Los Angeles Times published an article entitled "He was a billionaire who donated to the Clinton Foundation.  Last year, he was denied entry into the U.S.," by Joe Tanfani, reporting that Gilbert Chagoury applied for and was denied a visa.  (Exhibit A, attached hereto).

66.     According to the LA Times article, as detailed in Paragraphs 10(A)-10(D), the sources of Tanfani's information included FBI intelligence reports, interagency memos, government documents and "other allegations from intelligence and law enforcement sources," none of which should have been available to Tanfani and would not have been but for an unlawful leak on the part of the defendant agencies.

67.     The LA Times article states that "interagency memos" show "[t]he U.S. put Chagoury in its database used to screen travelers for possible links to terrorism" based on allegations he was "facilitating fundraising for Hezbollah," further evidencing Joe Tanfani was provided misinformation concerning Gilbert Chagoury that is stored in government databases.

68.     Further, the LA Times article referenced the reported No Fly list incident and suggested that Gilbert Chagoury's prior inclusion on the No Fly list was based on "unspecified suspicions of links to terrorism, which can include financing terrorist organizations," which Tanfani reported were reflected in a "Homeland Security document."  This misinformation was not previously reported in connection with the 2010 leak(s) and appears to have been leaked to Tanfani.

69.    Upon information and belief, the unlawfully disclosed information referenced in the LA Times article was disclosed by agents of the FBI, DOJ, NCTC, State Department, CIA, DHS, and/or CBP.

70.    In preparing for his article, Tanfani, asked for comment on his statement that "Mr. Chagoury and members of his family last year were denied visas to enter the U.S. because of reports in government databases alleging that he may have provided support to terrorism – so called 3B grounds under the Immigration and Naturalization Act, according to sources. Specifically, there have been unconfirmed reports to US agencies that he may have provided support to Hezbollah, in cooperation with Gen. Michel Aoun."

71.    Tanfani's questions and the content of his article show knowledge of information – albeit false information – stored in "government databases" that he could only access by means of an unlawful government leak.

72.    Upon information and belief, the Government's agent who leaked information and misinformation concerning Gilbert Chagoury did so intentionally to harm him, or at least with reckless and deliberate indifference to whether it would cause him harm.  Indeed, the LA Times article does not refer directly to the source of the confidential government documents on which they relied, presumably because the source spoke to the media only on condition of anonymity given the illegality of leaking the misinformation or information at issue.

73.    Further evidencing the willful and intentional nature of the Defendants violation, this is part of a pattern of wrongful and unlawfully leaked misinformation and information injuring Gilbert Chagoury.

13

74.   In 2012, President Obama declared a "zero tolerance" policy against government leakers.[3]

75.   More recently, in March 2017, President Trump criticized the leaking of classified information and demanded leakers be found and stopped.[4]

76.   At no point in time did Gilbert Chagoury consent to any Government agency or Department disclosing information that his visa application was denied, that he had previously been placed on the Selectee or No Fly lists or any other information or misinformation about him.

77.   At no point in time was Gilbert Chagoury afforded notice or an opportunity to be heard prior to the Government's disclosure of information and misinformation relating to him.

78.   At no point in time was Gilbert Chagoury afforded an opportunity to be heard or any other post-deprivation remedy after the Government's disclosure of information and misinformation relating to him.

79.   The LA Times report has instigated a spate of additional stories repeating and further disseminating information about the denial of Gilbert Chagoury's visa, prior reported placement on the No Fly list, and the misinformation that reportedly provided the grounds for these Government actions – that Gilbert Chagoury has provided material support to a terrorist organization such as Hezbollah.

80.   Gilbert Chagoury has never provided any financial or any other support to Hezbollah or any other terrorist organization.  He has supported organizations providing food

---

[3] US Department of Justice, *Attorney General Guidelines for Victim and Witness Assistance* (2011 ed., revised May 2012), *available at* http://www.justice.gov/olp/pdf/ag_guidelines2012.pdf.

[4] Trump, Donald (@realDonaldTrump). "The real story that Congress, the FBI and all others should be looking into is the leaking of Classified information. Must find leaker now!" March 20, 2017. 4:02 AM. Tweet.

and shelter to Christians turned into refugees by the civil war in Syria, but by no stretch of the imagination may he be considered the source of assistance to terrorist organizations.

81.   The Government's failure to publicly deny the accusations concerning Gilbert Chagoury's alleged links to terrorism in the articles lends them the Government's tacit approval and support.

82.   Gilbert Chagoury has suffered adverse effects as a result of the leak to the LA Times and the Government's failure to publicly rebut the accusations made including, but not limited to, stigma and humiliation.

83.   The Government's unwillingness or inability to stop the recurring leaks of misinformation concerning Gilbert Chagoury, combined with its tacit approval and support of these wrongful accusations, leads the public to believe them, exacerbating the damage to Gilbert Chagoury.  This is not simply a matter of harm to Gilbert Chagoury's reputation or of lost business opportunities.  Hezbollah has enemies.  Hezbollah today is locked in a deadly Syrian conflict with Islamic State (also known as ISIS or ISIL).  Islamic State has not limited its actions to Syria and Iraq.  It has killed dozens in terrorist attacks aimed at its enemies in Paris and other Western European nations. To be falsely cast as a supporter of Hezbollah is to have one's life and the lives of one's family put at risk.

### Bank Reaction to the LA Times Article

84.   The United States Government strictly regulates banks.

85.   Among the many banking regulations, the United States Government demands banks vigilantly guard against allowing suspected financiers of terrorism from opening or maintaining accounts or transferring money into or out of their banks.

86.   The Office of Foreign Assets Control ("OFAC") maintains a list of Specially Designated Nationals ("SDNs") with whom U.S. persons and entities, including banks and financial institutions, are prohibited from transacting business, subject to penalties.  The Secretary of State and the Secretary of the Treasury can, pursuant to Executive Order 13224 of September 23, 2001 (66 FR 49079, September 25, 2001), designate individuals for the SDN list.

87.   Gilbert Chagoury has not been designated an SDN.

88.   Beyond the SDN list, "Know-Your-Customer" or "Customer Identification Program" rules promulgated by the United States Government cause banks vigilantly to avoid doing business with any person or entity whose reputation has been put in doubt, regardless of the truth of the matter.

89.   Banks are also subject to ongoing regulatory scrutiny to ensure that their Customer Identification Program and Customer Due Diligence procedures are functioning effectively.

90.   These rules particularly warn banks that they must "include procedures for determining whether the customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency and designated as such by Treasury in consultation with the Federal functional regulators."  31 C.F.R. § 1020.220(a)(4).  The rules do not caution banks to avoid relying on unauthorized or unlawful leaks by government officials.

91.   In addition, the criminal money laundering statutes create potential criminal liability for banks and bank officers if there is knowledge or willful blindness that a customer is using the bank to move illegally derived funds or funds intended to finance illegal activities.  18 U.S.C. §§ 1956, 1957.

92.    Under Section 352 of the USA Patriot Act, banks are required by law to have a board-approved Anti-Money Laundering and Countering the Financing of Terrorism compliance program.

93.    Banks are predictably risk-averse; allegations in a news article of unconfirmed claims that an individual financially supported terrorism, occurring against the backdrop of United States banking regulations including, but not limited to, those listed above, will lead banks to refuse to transact business with that individual, regardless of the veracity or source of that information.

94.    As reflected in the Report of Barry Koch ("Koch Report") attached as Exhibit 1 to the Declaration of Barry M. Koch in Support of Plaintiff Gilbert Chagoury's Second Amended Complaint (Exhibit B, attached hereto), Gilbert Chagoury is a "politically exposed person" or "PEP" who is required to be subject to enhanced scrutiny under Section 312 of the USA Patriot Act.  Some banks might choose not to do business with Gilbert Chagoury for this reason alone. And, as a result of Gilbert Chagoury's PEP status, banks who would otherwise do business with him would be especially sensitive to any adverse information published about him.

95.    Prior to the leak complained of herein, there were occasions where Gilbert Chagoury had difficulty persuading banks to do business with him and instances in which banks refused to transact with him.

96.    According to Barry Koch, who has served in high-level positions at financial institutions and is a recognized expert on international compliance and anti-money laundering issues, the misinformation the Government allegedly unlawfully leaked has made it even more difficult, approaching impossible, for Gilbert Chagoury to bank in the United States, effecting a

status change in his ability to engage in financial transactions in the present and for the foreseeable future.

97. By leaking misinformation regarding Gilbert Chagoury, the leaking government agency triggered what amount to financial sanctions on Gilbert Chagoury by encouraging banks not to engage in financial transactions with him, without providing him any due process whatsoever. As reflected in the Koch Report, banks evaluating Gilbert Chagoury as a potential customer, considering the public information about him, will be substantially influenced by the report of Gilbert Chagoury's alleged link to terrorism and funding for Hezbollah, in particular, especially as attributed to Government sources and documents in the LA Times article.

98. Limitations on Gilbert Chagoury's ability to transfer money to banks in the United States mean that he has found it increasingly difficult to pay for substantial maintenance, property taxes, and other continuing expenses related to the house in Beverly Hills. These limitations created a distressed sale situation, pressuring him to sell his property for less than what he believes is its fair value.

99. As the Koch Report demonstrates, the increased challenges approaching impossibility that Gilbert Chagoury now faces banking in the United States are an entirely predictable and ongoing consequence of the leak to the LA Times and subsequent news stories.

100. Thus, the actions of the United States Government, by means of the intentional and willful leak of misinformation regarding Gilbert Chagoury, created this ongoing deprivation of his property rights and did so without providing due process.

101. As a result of the Government leaks, Gilbert Chagoury has been deprived of his right to engage in financial transactions and his right to travel into the United States, both of which represent ongoing deprivations as long as the Government maintains false information

18

implicating him in their databases and allows the public, and especially the banks, to believe the same – a belief generated by the Government.  He further suffers a substantial risk of future leaks as shown by the pattern of damaging leaks targeting him personally and the Government's apparent failure to seek to identify the leakers and discipline them; having already happened twice and the leakers apparently not having faced any repercussions, there is no reason to believe it will not continue to occur unless the Government is directed to take action.

## Count I

### (PROCEDURAL DUE PROCESS)

### (AS AGAINST ALL DEFENDANTS)

102.  Plaintiff incorporates the allegations contained in Paragraphs 1-101 as if fully set forth herein.

103.  The Fifth Amendment to the United States Constitution states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

104.  The right to travel, including the right to travel in and out of the United States, is part of the liberty interest protected under the due process clause of the Fifth Amendment.

105.  Gilbert Chagoury, as a nonresident alien with substantial ties to the United States, is entitled to the due process protection of the Fifth Amendment, including with regard to the right to travel in and out of the United States.

106.  Upon information and belief, the Defendant agencies' maintenance of false information in government databases directly and proximately caused Gilbert Chagoury to be placed on the Selectee or No Fly lists, have his visa revoked, and to be denied a new visa.

107.  The same can reasonably be inferred from the LA Times article written by Joseph Tanfani, in which he cited "interviews and government documents" for the fact that Gilbert Chagoury was denied a visitor's visa, "[b]ased upon the FBI report and other allegations from intelligence and law enforcement sources," referring to: (A) A "Homeland Security document [that] shows agents citing unspecified suspicions of links to terrorism, which can include financing extremist organizations"; and (B) "A 2013 FBI intelligence report, citing unverified raw information from a source, claimed Chagoury had sent funds to Aoun, who transferred money to Hezbollah.  The source said Aoun was 'facilitating fundraising for Hezbollah.'  The U.S. put Chagoury in its database used to screen travelers for possible links to terrorism, interagency memos show."

108.  Gilbert Chagoury is not challenging the denial of his visa, only the inclusion of false information in government databases that likely led to his visa denial and was unlawfully leaked.  Removal of the false and defamatory "facts" cited in Paragraphs 10(A) and 10(C) would make a grant of a visa in the future more likely.

109.  Upon information and belief, Gilbert Chagoury has, for all intents and purposes, no chance of receiving a visa to reenter the United States so long as the misinformation continues to exist in a government database, meaning the maintenance of the misinformation by the Defendant agencies effectively acts as a deprivation of his liberty interest in entering this country.

110.  The leak of false and defamatory information concerning Gilbert Chagoury, including, but not limited to, allegations that he has funded a terrorist organization, has caused great reputational harm and stigma.

111.  Gilbert Chagoury has been afforded no opportunity to be heard to disprove the false information in government databases, despite the significant reputational harm caused by the leak of the false information and their acting and continuing to act to deprive him of his liberty interests.

112.  Gilbert Chagoury has no forum in which to seek redress or an opportunity to be heard other than this court to challenge the misinformation concerning him contained in government databases and no opportunity to submit evidence that he is not a terrorist threat. Depriving Gilbert Chagoury of access to any procedure to vindicate his due process rights prior to or post the deprivation of his liberty interest violates the Due Process Clause of the Fifth Amendment.

113.  Defendants have acted, and continue to act, to deprive Gilbert Chagoury of his constitutional rights.  He is suffering and will continue to suffer irreparable injury as a result of the practices described in this complaint unless those practices are enjoined by this Court, including but not limited to the Defendants' continued maintenance of the false information concerning him in Government databases, as detailed in Paragraphs 10(A) and 10(C).

114.  Gilbert Chagoury has no plain, adequate, or speedy remedy at law and is entitled to declaratory and injunctive relief against defendants.

115.  As a result, Gilbert Chagoury is entitled to a name-clearing hearing, at which he has a meaningful opportunity to challenge the misinformation about him leaked by the Government, specifically including the "facts" claimed in the LA Times article cited in Paragraphs 10(A) and 10(C), including allegations that he has "links to terrorism" and the claim that he provided money to General Aoun that was funneled to Hezbollah.  In the event that Chagoury is successful in refuting these allegations, the Government should be required to provide him with

documentation and make a public statement that he is not and has never been on the SDN list, that this misinformation was unlawfully leaked and that it has been found to be inaccurate.

116. Further, Plaintiff is entitled to an injunction to undo the harm the Government caused. Specifically, this court should issue an order requiring the Defendants to remove any false information regarding him from their databases.

117. Gilbert Chagoury is further entitled to an Order requiring Defendants to communicate the removal of the complained of misinformation from Government databases to the United States Visa Office, the United States Embassy in Paris, France, and any other government agency, foreign or domestic, that may rely on Defendants' databases to identify visa applicants who may be inadmissible pursuant to Section 212(a)(3)(B) of the Immigration and Nationality Act, and to state said debunked misinformation should have no bearing on any future visa applications.

**Count II**

**(PROCEDURAL DUE PROCESS)**

**(AS AGAINST ALL DEFENDANTS)**

118. Plaintiff incorporates the allegations contained in Paragraphs 1-117 as if fully set forth herein.

119. The Fifth Amendment to the United States Constitution states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

120. The Fifth Amendment's Due Process Clause protects Gilbert Chagoury's liberty and property interests from deprivation by the United States without due process of law.

121.  Gilbert Chagoury is not a terrorist threat and there is no reasonable basis on which to conclude he is a terrorist threat.

122.  The disclosure and publication of Gilbert Chagoury's denied visa, and the alleged grounds for the denial - in general that he has provided material support to terrorism and in detail as laid out in Paragraphs 10(A) and 10(C) - has injured his good name, reputation, honor, and integrity and has generated a cloud of suspicion that is not consistent with the decent and honorable person who Gilbert Chagoury is.

123.  In addition to the stigma described in Paragraph 122, as a proximate and predictable result of Defendants' actions and explained in detail in the Koch Report, the leak has made it even more difficult, nearing impossible, for Gilbert Chagoury to bank in the United States, effecting a status change in his ability to engage in financial transactions.

124.  Gilbert Chagoury has encountered difficulties paying the substantial expenses associated with the Beverly Hills property and attending to his financial interests, causing him significant financial injury, and ultimately leading him to agree to sell the house at what he believes to be a deep discount.  As a result, Gilbert Chagoury has been deprived of property and/or financial interests in the United States including the home in Beverly Hills and the use and enjoyment thereof

125.  As reflected in the Koch Report, banks evaluating Gilbert Chagoury as a potential customer will consider public information regarding him and will be substantially influenced by the Government's alleged finding of a link from Gilbert Chagoury to terrorism and Hezbollah, as reported in the LA Times article.

126.  The Government's unlawful leak of information and misinformation regarding Gilbert Chagoury has deprived him of property interests protected by the Due Process Clause of the Fifth Amendment.

127.  The Due Process Clause of the Fifth Amendment requires that Gilbert Chagoury be given notice and an opportunity to be heard prior to the Government depriving him of his liberty interests or of the use, enjoyment and value of his property rights in the United States, or alternatively a post-deprivation opportunity to be heard regarding the deprivation.

128.  Gilbert Chagoury received neither notice nor opportunity to be heard prior to the Government, via its unlawful leak by unknown agents and by encouraging or requiring U.S. banks to rely on such leaks in deciding whom to do business with, denying him liberty and property rights in the United States.

129.  Gilbert Chagoury has similarly received no post-deprivation opportunity to be heard.

130.  Gilbert Chagoury reasonably fears further leaks of false, nonpublic information concerning him unless and until the Defendants take steps to identify and discipline the leakers. He equally reasonably fears, as reflected in the Koch Report, an ongoing inability to bank in the United States, unless and until the Government takes steps to dispel the false belief – created by its own leak – that he is linked to terrorism and Hezbollah.

131.  Gilbert Chagoury is suffering and will continue to suffer irreparable injury as a result of the repeated unlawful leaks about him and other practices described in this Complaint unless those practices are enjoined by this Court.

132.  The Government's failure to disavow the misinformation creates an ongoing harm to Gilbert Chagoury because it leads observers, including the banks refusing to transact with Mr.

Chagoury, to believe that the United States Government's information is accurate and that the Government's silence is tacit confirmation of the false information.

133.   Now that the misinformation has been leaked, nothing short of correcting the misinformation in the public sphere will cure the violation by giving banks the comfort they need to freely transact business with Gilbert Chagoury.  As explained in the Koch Report, banks will be significantly more likely to transact with Gilbert Chagoury if he succeeds in discrediting the leaked information claiming that he has links to terrorism and Hezbollah.

134.   Gilbert Chagoury has no plain, adequate, or speedy remedy at law and is entitled to declaratory and injunctive relief against defendants.

135.   Gilbert Chagoury has no forum in which to seek redress or an opportunity to be heard other than this court to challenge the misinformation concerning him contained in government databases and no opportunity to submit evidence that he is not a terrorist threat. Depriving Gilbert Chagoury of access to any procedure to challenge the underlying information – a necessary step in maintaining his liberty and property rights – violates the Due Process Clause of the Fifth Amendment.

136.   As a result, Gilbert Chagoury is entitled to a name-clearing hearing, at which he has a meaningful opportunity to challenge the misinformation about him leaked by the Government, specifically including the "facts" claimed in the LA Times article cited in Paragraphs 10(A) and 10(C), including allegations that he has "links to terrorism" and the claim that he provided money to General Aoun that was funneled to Hezbollah.  In the event that Chagoury is successful in refuting these allegations, the Government should be required to provide him with documentation and make a public statement that he is not and has never been on the SDN list, that this misinformation was unlawfully leaked and that it has been found to be inaccurate.

137.  Further, Defendants should be ordered to make good faith efforts to identify and discipline any agents involved in leaking Gilbert Chagoury's information and misinformation concerning him, and also to institute procedures that mitigate the future risk of leaks.

### Relief Requested

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

138.  Grant an injunction requiring Defendants to provide Plaintiff a post-deprivation opportunity to be heard; namely, a name-clearing hearing, at which he has a meaningful opportunity to challenge the misinformation about him leaked by the Government, specifically including the "facts" claimed in the LA Times article cited in Paragraphs 10(A) and 10(C), including allegations that he has "links to terrorism" and the claim that he provided money to General Aoun that was funneled to Hezbollah;

139.  Order the United States Government to undo the harm it has caused by requiring the Defendants to remove any false information regarding him from their databases, including but not limited to the "facts" claimed in the LA Times article cited in Paragraphs 10(A) and 10(C), including allegations Gilbert Chagoury has "links to terrorism" and the claim that he provided money to General Aoun that was funneled to Hezbollah;

140.  Order the Government to provide Gilbert Chagoury with documentation and make a public statement that he is not and has never been on the SDN list, that the misinformation cited in Paragraphs 10(A) and 10(C) was unlawfully leaked and that it has been found to be inaccurate, including allegations Gilbert Chagoury has "links to terrorism" and the claim that he provided money to General Aoun that was funneled to Hezbollah;

141.  Order the United States Government to communicate the removal of the complained of misinformation from Government databases to the United States Visa Office, the

United States Embassy in Paris, France, and any other government agency, foreign or domestic, that may rely on Defendants' databases to identify visa applicants who may be inadmissible pursuant to Section 212(a)(3)(B) of the Immigration and Nationality Act, and to state said debunked misinformation should have no bearing on any future visa applications;

142.  Order the United States Government to take affirmative steps in good faith to identify and discipline any and all agents that played a role in the leak of information and misinformation concerning Gilbert Chagoury, and further that the United States Government put in place procedures to mitigate the risks of future leaks;

143.  Award Gilbert Chagoury his costs and reasonable attorneys' fees incurred in this action; and

144.  Grant such other relief as the Court may deem just and proper.

Dated:  April 26, 2017

Respectfully submitted,
STEPTOE & JOHNSON LLP

 /s/ Stewart Baker

Stewart A. Baker (DC Bar No. 262071)
Jennifer Quinn-Barabanov (DC Bar No. 452644)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-3000
sbaker@steptoe.com
jquinnba@steptoe.com

Attorneys for Plaintiff GILBERT R. CHAGOURY

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 26, 2017, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system, which shall send notice to all counsel of record.


  /s/ Stewart Baker_____
Stewart Baker

EXHIBIT A

# He was a billionaire who donated to the Clinton Foundation. Last year, he was denied entry into the U.S.



Joseph Tanfani
Nigerian billionaire Gilbert Chagoury, one of Africa's richest men, has built a reputation as a giant of global philanthropy.

His name is on a gallery at the Louvre and a medical school in Lebanon, and he has received awards for his generosity to the Catholic Church and St. Jude's Children's Hospital. He owns a seven-bedroom hilltop mansion in Beverly Hills, and he has a high-level network of friends from Washington to Lebanon to the Vatican, where he serves as an ambassador for the tiny island nation of St. Lucia. His website shows him shaking hands and laughing with Pope Francis.

ADVERTISING
"I never imagined what the future would hold for me," Chagoury once said of his boyhood in Nigeria. "But I knew there was a vision for my life that was greater than I could imagine.... I consider it a duty to give back."

Since the 1990s, Chagoury has also cultivated a friendship with the Clinton family — in part by writing large checks, including a contribution of at least $1 million to the Clinton Foundation.

By the time Hillary Clinton became secretary of State, the relationship was strong enough for Bill Clinton's closest aide to push for Chagoury to get access to top diplomats, and the agency began exploring a deal, still under consideration, to build a consulate on Chagoury family land in Lagos, Nigeria.

But even as those talks were underway, bureaucrats in other arms of the State Department were examining accusations that Chagoury had unsavory affiliations, stemming from his activities and friendships in Lebanon. After a review, Chagoury was refused a visa to enter the U.S. last year.

Chagoury is a prominent example of the nexus between Hillary Clinton's State Department and the family's Clinton Foundation, which has come under renewed scrutiny during her presidential run. The organization, founded as a way for the Clintons to tap their vast network for charitable works, has tackled some of the steepest challenges in the developing world, including rebuilding Haiti and fighting AIDS in Africa. It has also come under fire for its willingness to accept money from foreign governments with interest in swaying U.S. policy during Clinton's time as secretary of State, and the controversial histories of some donors.

**Part of a dictator's inner circle**

Chagoury was born in 1946 in Lagos to Lebanese parents, and as a child attended school in Lebanon. He sold shoes and cars in Nigeria, according to a biography on his website, before marrying the daughter of a prominent Nigerian businessman.

During the rule of Gen. Sani Abacha, who seized power in Nigeria in 1993, Chagoury prospered, receiving development deals and oil franchises.

In the 1990s, Chagoury portrayed himself as an Abacha insider as he tried to influence American policy to be more friendly to the regime. Soon after President Clinton named Donald E. McHenry a special envoy to Nigeria in 1995, Gilbert and brother Ronald Chagoury visited McHenry in his office at Georgetown University in Washington. The U.S. was pushing for the return of democratic rule in Nigeria; Abacha, meanwhile, was eager to have his country taken off a U.S. list of nations that enabled drug trafficking, McHenry said.

"Their effort was to try and influence anyone who they thought could influence the U.S. government," McHenry said, adding that the approach was heavy-handed. "They tried every key on the piano."

Abacha turned out to be "one of the most notorious kleptocrats in memory," stealing billions in public funds, acting Assistant Atty. Gen. Mythili Raman later said.

After Abacha's death in 1998, the Nigerian government hired lawyers to track down the money. The trail led to bank accounts all over the world — some under Gilbert Chagoury's control. Chagoury, who denied knowing the funds were stolen, paid a fine of 1 million Swiss francs, then about $600,000, and gave back $65 million to Nigeria; a Swiss conviction was expunged, a spokesman for Chagoury said.

**Ties to the Clintons**

In the years afterward, Chagoury's wealth grew. His family conglomerate now controls a host of businesses, including construction companies, flour mills, manufacturing plants and real estate.

He has used some of that money to build political connections. As a noncitizen, he is barred from giving to U.S. political campaigns, but in 1996, he gave $460,000 to a voter registration group steered by Bill Clinton's allies and was rewarded with an invitation to a White House dinner. Over the years, Chagoury attended Clinton's 60th birthday fundraiser and helped arrange a visit to St. Lucia, where the former president was paid $100,000 for a speech. Clinton's aide, Doug Band, even invited Chagoury to his wedding.

Chagoury also contributed $1 million to $5 million to the Clinton Foundation, according to its list of donors. At a 2009 Clinton Global Initiative conference, where business and charity leaders pledge to complete projects, the Chagoury Group's Eko Atlantic development — nine square kilometers of Lagos coastal land reclaimed by a seawall — was singled out for praise. During a 2013 dedication ceremony in Lagos, just after Hillary Clinton left her post as secretary of State, Bill Clinton lauded the $1-billion Eko Atlantic as an example to the world of how to fight climate change.

"I especially thank my friends Gilbert and Ron Chagoury for making it happen," he said.



By last summer, U.S. diplomats had selected a 9.9-acre property at Eko Atlantic as the preferred site for a new Lagos consulate, State Department documents obtained by the Los Angeles Times show. Two months ago, James Entwistle, then the U.S. ambassador to Nigeria, wrote to Washington, asking permission to sign a 99-year lease.

No deal has been signed, State Department spokeswoman Elizabeth Trudeau said. She did not answer questions about whether the Clintons recommended Eko Atlantic. She said at a recent briefing that she was unaware of whether Hillary Clinton knew the site was under consideration; it was on a list of possibilities submitted by a real estate firm in 2012, Trudeau said in response to questions from The Times. A spokesman for Clinton's campaign noted that the State Department has said the process has been managed by "career real estate professionals."

Chagoury declined requests for an interview. A friend and spokesman, Mark Corallo, said Chagoury was a generous and "peace-loving" man unfairly scrutinized because of his association with the Clintons. He said Chagoury last saw Hillary Clinton at a 2006 dinner. The Clinton Foundation and a spokesman for Bill Clinton did not respond to requests for comment.

Chagoury also has given to Republicans: He and his brother, along with Eko Atlantic, are listed as sponsors for a 2014 art exhibit at the George W. Bush Presidential Center.

**Suspicions emerge in the U.S.**

In spite of his network of powerful friends, Chagoury has aroused the suspicions of U.S. security officials. In 2010, he was pulled off a private jet in Teterboro, N.J., and questioned for four hours because he was on the Department of Homeland Security's no-fly list. He was subsequently removed from the list and categorized as a "selectee," meaning he can fly but receives extra scrutiny, Homeland Security documents show. The agency later wrote to Chagoury to apologize "for any inconvenience or unpleasantness."

That letter did not explain why Chagoury was on the no-fly list, but another Homeland Security document shows agents citing unspecified suspicions of links to terrorism, which can include financing extremist organizations; Chagoury later told reporters that agents asked him what bank he used in Nigeria.

Chagoury believes it was unfair for government officials to disclose the episode and to "suggest that he was a potential threat," Corallo said. He said that Chagoury's lawyers resolved the issue and that he never asked anyone else for help.

Chagoury told ABC News and the Center for Public Integrity at the time that he was miffed because his travel problems made him miss seeing the Lakers in the playoffs. "I just love the Lakers," he said.

His visa troubles stem at least in part from his involvement in the tangled politics of Lebanon. Chagoury has contributed to charitable projects there, advocated on behalf of the country's Christians and formed political alliances, including with Michel Aoun, a Lebanese Christian politician who served as army commander and prime minister during the country's civil war.

For a decade, Aoun's party has been part of a political coalition with Hezbollah, the Shiite Muslim group backed by Iran that has seats in Lebanon's parliament. Hezbollah is classified as a terrorist organization by the U.S., which holds the group responsible for the 1983 bombing of the U.S. embassy in Beirut and a Marine barracks blast that year that killed 241 American servicemen. Drug Enforcement Administration investigations have also found that Hezbollah is in league with Latin American cartels to launder hundreds of millions of dollars in drug profits.

Chagoury was "known to have funded" Aoun, a Lebanese government minister told then-Ambassador Jeffrey D. Feltman in 2007, according to a cable published by WikiLeaks that didn't go in detail about Chagoury's relationship with Aoun. The minister suggested that the U.S. "deliver to Chagoury a strong message about the possibility of financial sanctions and travel bans against those who undermine Lebanon's legitimate institutions."



Chagoury never got a scolding, though. Instead, Band, Bill Clinton's aide, pushed for new access for Chagoury after Hillary Clinton took over at the State Department. In 2009, Band wrote his friends in the department. "We need Gilbert Chagoury to speak to the substance guy re Lebanon. As you know he's key guy there and to us and is loved in Lebanon. Very imp." Huma Abedin, a longtime aide and confidante to Clinton and now vice chairwoman of her presidential campaign, suggested Feltman.

When Band's email was made public this month, Donald Trump pounced, calling the Chagoury episode "illegal" and a "pay-to-play" scheme.

But no meeting ever happened, according to both Feltman and Chagoury's spokesman. Chagoury wanted only to pass along insights on Lebanese politics, Corallo said, adding that "nothing ever came of it" and that Chagoury never talked to anyone at the State Department. Band declined to comment for this story.

A Clinton campaign spokesman said Judicial Watch, the conservative organization that sued to make the emails public, "has been attacking the Clintons since the 1990s."

"No matter how this group tries to mischaracterize these documents, the fact remains that Hillary Clinton never took action as secretary of State because of donations to the Clinton Foundation," spokesman Josh Schwerin said.

This month, the foundation announced that it would stop accepting donations from foreigners and corporations should Clinton win the presidency.

**Denied a visa**

After Clinton left the State Department, Chagoury again found himself under suspicion by U.S. security officials. A 2013 FBI intelligence report, citing unverified raw information from a source, claimed Chagoury had sent funds to Aoun, who transferred money to Hezbollah. The source said Aoun was "facilitating fundraising for Hezbollah." The U.S. put Chagoury in its database used to screen travelers for possible links to terrorism, interagency memos show.

The ties between Chagoury and Aoun ended years ago in a dispute over oil franchises, said Michel de Chadarev, an official with Aoun's party. Chagoury now backs an Aoun rival for the presidency. De Chadarev said Aoun "categorically denied" any arrangement where he shared money with Hezbollah or passed funds from Chagoury: "No, no, no. Of course not. It is not in his principles to act as transporter to anyone."

Last summer, when Chagoury planned a trip to Los Angeles, he applied at the U.S. embassy in Paris for a visitor's visa and was refused, according to interviews and government documents. Based on the FBI report and other allegations from intelligence and law enforcement sources, the State Department denied the application. It cited terrorism-related grounds, a broad category that can apply to anyone believed to have assisted a terrorist group in any way, including providing money.

Chagoury has denied ties to Hezbollah. Two years ago, he helped pay for a conference in Washington on the persecution of Christians in the Middle East; some attendees supported Hezbollah, but the director of the group that organized the conference said that didn't mean Chagoury or other conference organizers were among them. "Hezbollah is part of the political reality of the country," Andrew Doran told the National Review.

Corallo did not answer questions about the visa denial, but said Chagoury "has been a friend and supporter of America all his life" and that "any allegation that Mr. Chagoury is involved in any way with providing material support to any terrorist organization, of any stripe, is false, outrageous and defamatory." He said Chagoury has no business interests in Lebanon.

The visa decision process is opaque and provides little recourse for those who are denied entry. Typically, the person is told of the grounds for refusal, but not the details. The secretary of State can grant a waiver, but that is often difficult when the evidence used to block entry is terrorism-related.

For the last three decades, Corallo said, Chagoury spent at least a few months each year in Beverly Hills, where he owns an 18,000-square-foot estate, once the home of actor Danny Thomas, with commanding views of West Los Angeles and the ocean.

A year ago, after his visa application was denied, Chagoury's mansion was put on the market, with an asking price of $135 million. It's still for sale.

**Twitter: [@jtanfani](@jtanfani)**

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GILBERT RAMEZ CHAGOURY,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION, et al.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)　　　Civil Case No. 16-1844 (TSC)<br>)<br>)<br>)<br>) |

**DECLARATION OF BARRY M. KOCH IN SUPPORT OF PLAINTIFF GILBERT**
**CHAGOURY'S SECOND AMENDED COMPLAINT**

I, Barry M. Koch, declare as follows:

1.　　　The matters set forth in this declaration and the attached exhibit are true of my own knowledge, except as otherwise stated herein and therein, and if called as a witness, I could and would testify to their truth.

2.　　　I have prepared the Expert Report of Barry M. Koch, dated April 25, 2017 in connection with the above-captioned matter, a true and correct copy of which is attached hereto as Exhibit 1.

3.　　　I have prepared this Expert Report at the request of counsel for Plaintiff, Gilbert Chagoury, to assist the court in understanding certain aspects of the allegations in the Second Amended Complaint that are within my expertise.

4.　　　As explained in detail in the attached Expert Report, the testimony contained therein is based on sufficient facts and data as represented to me.

5.　　　As explained in detail in the attached Expert Report, the testimony contained therein is the product of reliable principles and methods used by international compliance and anti-money laundering professionals, and I have reliably applied those principles and methods to the facts of the case.

6.     All of the opinions and conclusions expressed by me in Exhibit 1 have been stated within a reasonable degree of professional certainty.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on $\underline{26}$ day of April, 2017.

_____

Barry M. Koch

# EXHIBIT 1

## TO THE

## DECLARATION OF BARRY M. KOCH

**Gilbert Ramez Chagoury**
**Plaintiff**

**v.**

**Federal Bureau of Investigation**
**Department of Justice**
**National Counter Terrorism Center**
**Department of State**
**Central Intelligence Agency**
**Department of Homeland Security**
**and**
**United States Customs and Border Protection**

**Defendants**

**United States District Court**
**for the District of Columbia**
**Civil Case No. 16-1844**

**Expert Report of**
**Barry M. Koch, Esq., CAMS, CFCS**
**Barry M. Koch PLLC**

**26 April 2017**

# Table of Contents

1.  Introduction ...................................................................................................................... 1

2.  Professional Qualifications ................................................................................................ 1

3.  Regulatory Requirements for Opening and Maintaining a Bank Account in the U.S. ............ 4

4.  Analysis ............................................................................................................................. 6

5.  Opinions .......................................................................................................................... 11

6.  Conclusion ....................................................................................................................... 12

1. **Introduction**

   a.  My name is Barry Koch.  I am a lawyer who has practiced for more than 35 years, more than 20 of which have been in the field of Compliance in the financial services industry with a specialization in Anti-Money Laundering ("AML") and Countering the Financing of Terrorism ("CFT").  I now have my own consulting firm.  A copy of my CV is attached to this Report at Annex 1.

   b.  Counsel for Plaintiff Gilbert Ramez Chagoury has retained me as an expert witness in the above-captioned matter to submit an expert report, and testimony if necessary, concerning Plaintiff's claim that the Defendants' unlawful leak to the Los Angeles Times of false information about him, which was then published, will likely lead to Plaintiff's exclusion from the U.S. banking system.

   c.  In coming to the opinions expressed herein, I have reviewed Plaintiff's Complaint and other sources referenced below.  I reserve the right to revisit these opinions in subsequent Reports.

   d.  I confirm that the views expressed in this Report represent my independent opinion and fall within the areas of my expertise.  I know of no conflict of interest preventing me from acting as an expert in this proceeding.  I understand that my duty is to assist the Court in matters within my expertise, and that this duty overrides any obligation to those retaining me or to their clients.  I confirm that I have complied with that duty and will continue to do so.  I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent on the outcome of this case.

2. **Professional Qualifications**

   a.  I have worked in the financial services industry for more than 20 years, developing a specialized expertise in international compliance and anti-money laundering.  As described more fully below and in my attached CV, I have held senior Legal and Compliance positions at several global financial institutions.

      i.  From 1994 to 2001, I worked at **Smith Barney** as Head of International Compliance; Head of Anti-Money Laundering Compliance; and Head of Foreign Corrupt Practices Act and Sanctions Compliance. When I joined Smith Barney in 1994, it was a wholly-owned subsidiary of the Travelers Insurance Company.  In 1998, Travelers merged with Citicorp, to form **Citigroup**.  After the merger, I co-led the development and implementation of Citigroup's Global AML Program in addition to my existing Smith Barney responsibilities, until 2001.

ii.     In 2001, I joined Charles Schwab & Co. ("Schwab"), a US-based securities broker-dealer and international bank, as Senior Vice President of Risk Management and Investigations.   Schwab had recently acquired the United States Trust Company ("US Trust"), which was the subject of an Enforcement Action brought by its main US regulators, the Federal Reserve Bank of New York ("FRBNY") and the New York State Banking Department (now, the Department of Financial Services).   Pursuant to a Written Agreement with these regulators, US Trust undertook to remediate certain systemic weaknesses in its AML Compliance program. I was appointed by the Board of Directors of US Trust, and formally approved by the FRBNY and the Banking Department, to serve as the independent Bank Secrecy Act Officer responsible for leading US Trust's remediation efforts, which were ultimately successful and which resulted in the regulators lifting their enforcement Order.

iii.    In 2002, I joined **American Express Company** as the Global Head of Anti-Money Laundering.  In addition to AML, my portfolio included the global sanctions (OFAC) program, and the compliance programs for the Private Banking, Global Foreign Exchange and Travelers Cheques businesses.  At the time, **American Express Bank** was the sixth largest US Dollar-clearing bank in the world.  American Express Company operated four banks in the United States, with four different Federal regulators, and operated numerous regulated banks around the world.

iv.    In 2008, I was appointed Chief Compliance Officer of the Retail Bank of Washington Mutual ("WaMu").   Shortly after I joined WaMu, it was acquired by JPMorgan Chase ("JPMC"), and I became counsel for JPMC's global anti-money laundering program.  In this role, from 2008 to 2013, I provided legal advice on issues relating to transaction monitoring, criminal subpoenas, sanctions, anti-bribery and corruption, due diligence, data privacy, and the filing of Suspicious Activity Reports ("SAR"s).  I also worked closely with JPMC's Financial Intelligence Unit to develop *A Financial Footprint of Human Trafficking*, which served as the catalyst for the formation of the US and European *Bankers Alliances Against Human Trafficking*.

v.     From 2013 to 2015, I was the Chief Compliance Officer of **Western Union**, where I managed a global organization of approximately 2,200 professionals overseeing compliance with local laws in more than 200 countries.

vi.    In 2015, I joined the **New York County District Attorney's Office** as an Assistant District Attorney.   I served as Counsel to the Investigation Division, which housed the Major Economic Crimes, Counter Terrorism,

Cyber Crime, Asset Forfeiture, Fraud, Rackets, Tax Crimes, and Public Corruption bureaus.

vii.   Since leaving the DA's Office in 2016, I formed my own consulting firm, with a specialty in financial industry regulatory compliance and AML.

b.   In these positions, I developed expertise in the areas of correspondent banking; corporate, commercial, consumer and private banking; credit card issuing and merchant acquiring; and money transmission and ePayments.  I have personally created, tested, and implemented policies and procedures, as well as advanced technology systems, designed to address the money laundering and terrorist financing risks associated with all of these business lines.

c.   As a recognized AML subject matter expert, I periodically taught the Advanced SAR course at the United States Department of Justice's national training center for Federal law enforcement, and I have delivered AML compliance training to the Criminal Division of the Internal Revenue Service and to the New York field office of the Department of Homeland Security.

d.   I have been an active participant in the work of **The Wolfsberg Group**, an association of thirteen global banks which develops frameworks and guidance for the management of financial crime risks, particularly with respect to AML and Counter Terrorist Financing policies.  I contributed to the publication of *AML Principles* for Private Banking, Correspondent Banking, and for Credit Cards and Merchant Acquiring, as well as three published Guidance papers on *Anti-Corruption*; *A Risk-Based Approach to Managing Money Laundering Risk*; and *Beneficial Ownership, Politically Exposed Persons and Other Intermediaries*.

e.   I have also been an active participant in the work of the AML Committee of **The New York Clearinghouse** ("the Clearinghouse").  Owned by the world's largest commercial banks, the Clearinghouse provides payment, clearing, and settlement services to its member banks and other financial institutions, clearing almost $2 trillion daily and representing nearly half of the automated-clearing-house, funds-transfer, and check-image payments made in the United States.  I was a contributing author of numerous industry comment letters submitted by the Clearinghouse to US banking regulators regarding proposed banking regulations, particularly with respect to the CIP and CDD regulations.

f.   I was a principal architect of the financial industry's partnership with the United States Treasury Department's *Private Sector Dialog*, delivering numerous presentations to senior bankers, government officials, and Compliance officers in

the Middle East, North Africa, Latin America and Europe, on US regulation of correspondent banking.

g.    I have served on the Advisory Board of the **Association of Certified Anti-Money Laundering Specialists** ("ACAMS") and I currently serve as Chairman of the Advisory Board of the **Association of Certified Financial Crime Specialists**. I hold professional certifications from both organizations. I have also served on various committees of FinCEN's *Bank Secrecy Act Advisory Group* ("BSAAG"), created by the United States Congress to advise the Secretary of the Treasury on AML matters. While at American Express, I worked closely with FinCEN on the preparation of a correspondent banking manual for law enforcement.

h.    I have served as a member of the supervisory board of **Western Union International Bank GmbH**, an Austrian bank licensed and regulated by the Finanzmarktaufsicht (Financial Market Authority). In accordance with the FMA's rules and procedures, my knowledge of Austrian banking law was assessed by the FMA, after which they deemed me "fit and proper" to serve in a supervisory role at the bank.

3.    **Regulatory Requirements for Opening and Maintaining a Bank Account in the U.S.**

a.    Financial institutions in the United States are subject to strict regulation and supervision by regulators such as the Office of the Comptroller of the Currency, the FDIC, the Federal Reserve, the Securities and Exchange Commission, etc.

b.    Under the U.S. regulatory regime, banks maintain extensive, formal, and detailed compliance programs designed to prevent, detect and report money laundering and terrorist financing. The primary statutes under which the relevant anti-money laundering ("AML") and Countering the Financing of Terrorism ("CFT") rules have been promulgated are the Bank Secrecy Act and the USA PATRIOT Act.[1] Related to these two statutes, and included in banks' AML/CFT compliance programs, are the economic embargo programs, based on foreign policy and national security goals, administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

c.    U.S. law requires banks to have a board-approved AML/CFT compliance program.[2]

---

[1] The Currency and Foreign Transactions Reporting Act (Bank Secrecy Act of 1970), 31 U.S.C. 5311-5330; The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, October 26, 2001.

[2] The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (United States), 31 U.S.C. 5318, § 352.

i.      policies, procedures and controls reasonably designed to prevent, detect and report money laundering and the financing of terrorism;

ii.     designation of a Compliance Officer to oversee the effective functioning of the program;

iii.    a training program; and

iv.     an independent audit function to test the program.

**In addition, the program must include a board-approved Customer Identification Program ("CIP"), designed to allow the bank to reach a reasonable determination that it knows the true identity of its customers; and the program must include policies and procedures designed to identify and verify the "beneficial owners" of certain customers, and to establish anticipated account activity for purposes of effective transaction monitoring and ongoing customer due diligence ("CDD").**

d.      Banks invest heavily in personnel and technology systems to ensure that their CIP and CDD programs meet regulatory requirements, and banks are subject to ongoing regulatory scrutiny to ensure that their CIP and CDD procedures are functioning effectively.  Standard account opening procedures at these banks, which are audited regularly, involve: (1) conducting internet research for any negative information about a prospective customer (e.g., prior criminal convictions); (2) conducting research to establish and verify the prospect's source of wealth; (3) evaluating any negative information about the prospect provided by commercial (subscription) databases; and (4) performing electronic and documentary verification of the prospective customer's identity.

e.      In addition, banks use automated tools to screen prospective customers' names against various government lists of known or suspected terrorists or terrorist organizations, **and continue to use these resources on an ongoing basis to screen existing clients.**

f.      In light of the regulatory scrutiny in this area, as well as the risk of large financial penalties and criminal sanctions if a bank is found to have willfully violated these requirements, banks are understandably risk-averse when it comes to establishing or maintaining accounts for anyone whose name appears on any such lists or who is the subject of any material adverse media reports, regardless of the veracity of such reports.  In addition, in light of the recent trend toward holding individual employees personally liable for compliance failures through imposition of financial penalties and expulsion from the industry, many

Compliance Officers are similarly risk-averse when evaluating the appropriate course of action with respect to a "high-risk" account.[3]

g.  The following chart shows select financial penalties imposed by U.S. regulators and prosecutors on banks for systemic failures in AML and OFAC compliance programs.

| | | | | |
|---|---|---|---|---|
| BNP Paribas | $8.9 billion (2014) | | Western Union | $586 million (2017) |
| ING | $619 million (2012) | | Credit Suisse | $536 million (2009) |
| Lloyds TSB | $350 million (2009) | | Barclays | $298 million (2009) |
| Standard Chartered | $227 million (2012) $340 million (2012) $300 million (2014) | | JPMorgan Chase | $2 billion + (2013) |
| Commerzbank | $1.45 billion (2015) | | Citigroup | $140 million (2015) |
| HSBC | $1.96 billion (2012) | | Wells Fargo | $160 million (2010) |
| Deutsche Bank | $629 million (2017) $258 million (2015) | | Mega Bank | $180 million (2016) |
| Agricultural Bank of China | $180 million (2016) | | Intesa Sanpaolo | $235 million (2016) |
| Bank of Tokyo Mitsubishi | $250 million (2013) $315 million (2014) | | Royal Bank of Scotland | $50 million (2014) |

4.  **Analysis**

a.  To prepare this analysis, I performed certain account opening procedures that would be performed by virtually all banks when vetting a prospective customer like Plaintiff if he were seeking to open a new account.[4]  Specifically, I first performed internet research to find any relevant negative information (e.g., a prior criminal record).  By starting with a simple Google search of Plaintiff's name, I generated news reports and other sources of information about him

---

[3]  *In the Matter of Thomas Haider*, United States of America Department of the Treasury Financial Crimes Enforcement Network, No. 2014-08, Assessment of Civil Money Penalty, dated 18 Dec. 2014; Financial Industry Regulatory Authority, Press Release, "FINRA Fines Brown Brothers Harriman A Record $8 Million for Substantial Anti-Money Laundering Compliance Failures," dated 5 Feb. 2014, *available at* http://www.finra.org/newsroom/2014/finra-fines-brown-brothers-harriman-record-8-million-substantial-anti-money-laundering.

[4]  Due to Plaintiff's extremely high net worth, I assumed for these purposes that his account would be considered a "private banking" account, as that term is defined under Section 312 of the USA PATRIOT Act, and rules thereunder, and therefore subject to "Enhanced Due Diligence".  Plaintiff's status as a "Politically Exposed Person" ("PEP") under the same Section 312 would also subject him to the same enhanced due diligence requirement when opening a new account.

which I then evaluated as would an in-house Compliance Officer, to determine whether the Compliance department should approve the account opening.

b.      Some of the results that were generated provided information about Plaintiff's source of wealth, and business and personal histories.  The search results also generated a link to Plaintiff's company's website, which would typically be reviewed when conducting due diligence on a prospective customer in order to provide some corroboration of employment and source of income, and news articles about Plaintiff's philanthropic activities, prestigious honors and awards received, as well as certain negative media discussed in more detail below. [5]

c.      There is a substantial body of public information available about Plaintiff, some of it very positive, and some of it controversial.  A summary of the information that I found that would, in my opinion, be most relevant to a bank's analysis of whether to do business with Plaintiff is provided below.

d.      Born in Nigeria to Lebanese parents, Plaintiff is a British citizen who owns property in the United States and who has lawfully visited the United States many times over the years.  Plaintiff is a well-known philanthropist and public figure, currently serving as St. Lucia's Ambassador to the Holy See and as Ambassador to UNESCO, and as economic advisor to the President of Benin. Plaintiff:

   i.      has funded the establishment of a medical school and a nursing school at the Lebanese American University;

   ii.     is an active supporter of health, education, and infrastructure projects around the world,

   iii.    has donated millions of dollars to the Clinton Global Initiative,

   iv.     has funded scholarships and degree programs at multiple universities in the United States, and is a key benefactor to the St. Jude Children's Research Hospital in Memphis, Tennessee,

---

[5]  When establishing a new private banking account, the individual banker assigned to the relationship would typically conduct a face-to-face interview with the prospective customer, and would ask for certain documentation to corroborate the prospect's net worth (e.g., net worth statement prepared by an accountant) and source of wealth.  At some point prior to account opening, the bank's procedures would also involve identify verification via electronic means, and a check against OFAC's List of Specially Designated Nationals.  Some banks' policies and procedures would require letters of recommendation, a credit report, and a site visit to the prospect's place of business.

    v.       has been named Commander of Arts and Letters by the French Ministry of Culture for his contributions and donations to the Musee du Louvre, where he has a gallery named in his honor, and

    vi.     In 1990, Pope John Paul II awarded him the Order of Saint Gregory the Great for his generosity to the Church. In 2009, Pope Benedict XVI bestowed on him the Grand Cross, highest distinction of the Order of Saint Gregory the Great.[6]

e.       Plaintiff is also a prominent businessman.  He is the founder and Chairman of the Chagoury Group, an industrial conglomerate with multi-billion dollar assets in construction, manufacturing, insurance, real estate, telecommunications, and hotels, that employs thousands of people worldwide.[7]  In addition, I have been advised that:

    i.       He has previously held ten-year, multiple-entry U.S. tourist visas and has traveled regularly to the U.S. over the past 35 years.

    ii.     Until recently, he maintained a home in California, and frequently visited family members who are United States citizens and live in the United States.

    iii.    As an important industrialist in Nigeria, he has assisted U.S. Embassy personnel there whenever possible.

    iv.    Over the years, he has developed friendships with many prominent Americans including Government officials protected by the United States Secret Service, and similar agencies, and has been cleared by these security agencies to attend events with many current and former officials, including a former President of the United States.

f.       Despite the above-noted record of dedication to philanthropy and public service, Plaintiff's history is not free of controversy.

---

[6]  www.chagourygroup.com

[7]  www.chagourygroup.com

i.     Plaintiff was a known close associate of the late Nigerian dictator Sani Abacha.  Abacha, who died in 1998, reportedly stole more than $2.2 billion from state coffers during his rule.[8]

     (1)     Plaintiff prospered during General Abacha's rule, receiving development deals and oil franchises.

     (2)     After Abacha's death, the Nigerian government hired lawyers to track down the money.  The search identified bank accounts all over the world, some of which were under Plaintiff's control. Plaintiff, who denied knowing the funds were stolen, returned an estimated $300 million to the Nigerian government to secure his immunity from possible criminal charges.[9]

ii.     Various media sources have reported Plaintiff's earlier relationship and political alliance with Michel Aoun, a Lebanese politician who served as army commander and prime minister during Lebanon's civil war and who is the current President.  Aoun's party has been part of a political coalition with Iranian-backed Hezbollah, which is classified by the U.S. government as a terrorist organization.[10]

g.     In January 2010, Plaintiff's name was reportedly placed on the "No-Fly" List, a list created and maintained by the U.S. federal government's Terrorist Screening Center of people who are prohibited from boarding commercial aircraft for travel within, into, or out of the United States.[11]  The list has also been used to divert aircraft away from U.S. airspace that does not have start- or end-point destinations within the United States.[12]

h.     On January 15, 2010, Plaintiff was removed from a private jet at Teterboro airport in New Jersey and detained for questioning for more than four hours after federal agents discovered his name was on the then-recently updated No-

---

[8] http://www.nytimes.com/2004/08/19/world/late-nigerian-dictator-looted-nearly-500-million-swiss-say.html?_r=0

[9] https://en.wikipedia.org/wiki/Gilbert_Chagoury; the Wikipedia entry uses the term "indemnity" but the correct term is assumed to be "immunity".

[10] It is my view that most, if not all, of the major commercially available databases used to supplement the account opening due diligence would produce articles showing Plaintiff's status as a PEP, and reporting his link to the earlier Nigerian corruption scandal and the more recent connection to President Aoun.

[11] Based on my understanding of the record, there are conflicting descriptions regarding the precise nature of Plaintiff's status and ability to travel.  It is not clear to me whether Plaintiff's name was at some point removed from the No-Fly List and re-classified as a "Selectee"—a person warranting some enhanced scrutiny, but who is not technically on the No-Fly List—or whether Plaintiff was classified as a Selectee from the outset.  For purposes of the discussion herein, I have used the single term "No-Fly List", as it appears in numerous media accounts.

[12] https://en.wikipedia.org/wiki/No_Fly_List

Fly List.  Plaintiff was ultimately allowed to re-board and continue his trip. Shortly thereafter, ABC News reported the incident, and cited "law enforcement authorities" as the source of the information.[13]

i.    Plaintiff maintained that his name was wrongly placed on the List and sought redress by filing a petition with the Department of Homeland Security under the Traveler Redress Inquiry Program.  Plaintiff was successful in this effort; his name was reportedly removed from the List and he received a written apology from DHS.[14]

j.    On May 22, 2015, the State Department revoked Plaintiff's visa and required him to reapply, which he did.   His visa application was denied by the State Department in September 2015, on the statutory grounds that he "has provided material assistance to terrorism."[15]

i.    On August 28, 2016, the Los Angeles Times published an article reporting that Plaintiff had applied for, and had been denied, a visa.  The article reported that Plaintiff had possible links to terrorism, based on allegations that he earlier facilitated fundraising for Hezbollah.[16] According to the article, the source of [the] information was FBI intelligence reports, interagency memos, government documents and "other allegations from intelligence and law enforcement sources". According to Plaintiff, none of this information should have been available . . . and would not have been but for an unlawful leak on the part of the defendant agencies.[17]   In addition, the article reported that "according to a 2013 FBI intelligence report, citing unverified raw information from a source, [the source] claimed [that Plaintiff] had sent funds to Aoun, who transferred money to Hezbollah.  The source said Aoun was 'facilitating fundraising for Hezbollah.'"[18]

---

[13]   http://abcnews.go.com/Blotter/no-fly-terror-list-includes-big-donor-clinton-initiative/story?id=9791786
[14]   http://abcnews.go.com/Blotter/us-apologizes-billionaire-added-terror-fly-list/story?id=10698917
[15]   Immigration and Nationality Act, Section 212(a)(3)(b).
[16]   http://www.latimes.com/politics/la-na-pol-clinton-donor-chagoury-20160828-snap-story.html
[17]   Second Amended Complaint ¶ 66.
[18]   http://www.latimes.com/politics/la-na-pol-clinton-donor-chagoury-20160828-snap-story.html

k.  Plaintiff acknowledges that prior to the leak complained of herein, there were occasions where he had difficulty persuading banks to do business with him and instances in which banks refused to transact with him [19]

5.  **Opinions**

a.  Viewed against the backdrop of the intense regulatory scrutiny and significant financial risks of non-compliance, it was entirely foreseeable that it would be difficult, approaching impossible, for Plaintiff to bank in the United States after the allegedly leaked information was published in the LA Times reporting Plaintiff's alleged links to terrorism.

b.  As Plaintiff now considers his prospects for re-establishing a banking relationship, it is clear that his earlier reported link to the Nigerian corruption scandal, and his status as a Politically Exposed Person ("PEP")[20], will always surface in the course of a bank's account-opening due diligence, even without the alleged unlawful and unauthorized leak.  Despite these "red flags", I believe, based on my experience, that *some* banks would nevertheless decide to cautiously proceed with an account opening, taking the position that Plaintiff's more recent stature as a businessman, philanthropist, and diplomat, outweigh the negative media about a scandal that occurred nearly 20 years ago.  While I do not express herein a view as to whether that is a wise decision by such banks, I can state with certainty that some banks would in fact choose to proceed that way.  The Los Angeles Times article, however, stands out as particularly troubling in that it would discourage most, if not all, banks from proceeding this way because of its recency and, more importantly, its attribution to U.S. law enforcement and intelligence officials of Plaintiff's alleged links to Hezbollah financing.

c.  In the lawsuit, Plaintiff seeks an opportunity to clear his name by refuting the information allegedly leaked to the Los Angeles Times, specifically, his reported "links to terrorism" and the claim that he provided money to General Aoun that was funneled to Hezbollah.

d.  In my opinion, if Plaintiff is given an opportunity to clear his name, and succeeds at refuting these allegations that reportedly led to the denial of his visa and

---

[19] Second Amended Complaint ¶ 95.  Banks are permitted to share this type of information with other banks if the closure related to money laundering or terrorist financing concerns, and if the banks meet the requirements of Section 314(b) of the USA PATRIOT Act.

[20] In addition to his Wikipedia entry, Plaintiff would be listed as a PEP in most commercially available databases, due to his multiple Ambassadorial roles and his connections to the President of Benin and the late Nigerian leader.

placement on the "No Fly" list, his prospects for opening bank accounts in the U.S. would be materially enhanced.

6.   **Conclusion**

For the reasons set forth above, I conclude: (1) it was a direct and entirely foreseeable consequence of the leaked information concerning Plaintiff's alleged links to terrorist groups such as Hezbollah and specifically the claim that he was involved in funding Hezbollah that it would be nearly impossible for Gilbert Chagoury to bank in the United States; (2) that this leaked information published in the Los Angeles Times would substantially influence a bank's decision whether to do business with Gilbert Chagoury; and (3) that if Gilbert Chagoury succeeded in refuting this leaked information, his ability to bank in the United States would be materially enhanced.

Signed:   _____
                          BARRY M. KOCH

Dated:      April 26, 2017

Place of
Signing:    New York

Page 12 of 12

**Annex 1**



# BARRY M. KOCH

Mr. Koch is an independent consultant and private attorney recognized internationally as an expert in the field of anti-money laundering compliance and risk management. Mr. Koch most recently served as an Assistant District Attorney and Counsel to the Investigation Division in the New York County District Attorney's Office. The Investigation Division includes the Major Economic Crimes, Cybercrime, Rackets, Fraud, Tax, Asset Forfeiture, Corruption and Counterterrorism Bureaus, as well as the International Money Movement Center and Financial Intelligence Unit.

Prior to joining the DA's Office in November 2015, Mr. Koch was the Chief Compliance Officer of Western Union, where he managed a global department of more than 2,100 professionals with an annual budget of $215 million, responsible for AML/BSA/OFAC; Consumer Protection and Fraud Risk Management; Global Security; Internal Testing; Systems & Analytics; Training; Licensing and Regulatory Exams; Project Management; and Risk Assessments.

Mr. Koch was previously a Managing Director and Associate General Counsel at JPMorgan Chase, where he served for five years as the legal counsel for JPMC's global anti-money laundering compliance program.  In that capacity, he handled issues related to complex criminal investigations and subpoena compliance; and cases involving Black Market Peso Exchange, human trafficking, corruption and organized crime, terrorist financing and drug money laundering.

With extensive investigative and legal experience in money laundering and terrorist financing cases, he is a sought-after speaker at industry, government and law enforcement conferences, having presented to groups including the United States Department of Justice; the Departments of Homeland Security, State and Treasury; the IRS and DEA; members of the intelligence and diplomatic communities; the Federal Reserve Bank of New York; and regulators, legislators, international organizations and Financial Intelligence Units in Europe, Latin America, Canada, Asia Pacific, and the Middle East and North Africa.

Mr. Koch represented Western Union on FinCEN's Bank Secrecy Act Advisory Group ("BSAAG"), which was created by the U.S. Congress to advise the Secretary of the Treasury on Bank Secrecy Act issues.  He was a member of the Supervisory Board of Western Union International Bank GmbH, and is Chairman of the Advisory Board of the Association of Certified Financial Crime Specialists.  He has been an active participant in industry groups such as The Wolfsberg Forum, the New York Clearing House and American Bankers Association AML Committees, and the United States Treasury Department's AML *Private Sector Dialogue*.

Mr. Koch served as Chairman of the New York State Bar Association's *Committee on the United Nations*, as Chairman of *The Consular Law Society, Inc*., as Legal Counsel to *The Society of Foreign Consuls in New York* and as Co-Chairman of the New York Chapter of the Association of Certified

Anti-Money Laundering Specialists. He also taught courses in International Business Law as an adjunct faculty member of Fordham University's Graduate School of Business Administration.

At the 2014 *Not for Sale—Joining Forces Against Trafficking in Human Beings* conference convened by the Council of Europe and the OSCE, Mr. Koch delivered a presentation on *Customer and Financial Transaction Traits that May Present Risk for Human Trafficking*.  This was a follow- up to his earlier presentation to a plenary session of the United Nations Office on Drugs and Crime/OSCE's *Expert Seminar on Leveraging Anti-Money Laundering Regimes to Combat Human Trafficking*. A founding member of the U.S. and EU Bankers Alliances Against Human Trafficking, he has delivered similar presentations on the topic, including:

- *Investigating and Prosecuting Sex Trafficking: A Collaborative Approach*, hosted by the New York County District Attorney's Office and the John Jay College of Criminal Justice;
- *Identifying a Financial Footprint of Human Trafficking* at the National Association of Attorneys General *Presidential Initiative Summit—Pillars of Hope: Attorneys General United Against Human Trafficking;*
- *Combating the Commercial Sexual Exploitation and Sex Trafficking of Minors*, hosted by the Institute of Medicine of the National Academies*;*
- *Identifying a Financial Footprint of Human Trafficking*, at the *Trust Women: Putting the Rule of Law Behind Women's Rights* conference sponsored by the Thomson Reuters Foundation and the International Herald Tribune;
- Mt. Sinai Hospital Department of Pediatrics' *Conference on Child Abuse and Neglect and Commercial Sexual Exploitation and Sex Trafficking of Minors;*
- *Human Trafficking: Customer and Financial Transaction Traits that May Present Risk* at the *Human Rights Summit* sponsored by Human Rights First;
- *Identifying a Financial Footprint of Human Trafficking,* at the 2015 Annual Meeting of the Conference of Western Attorneys General; and
- *Increasing the Role of the Financial Services Industry in Combatting Human Trafficking,* at the Fifth Annual Cook County Human Trafficking Task Force Conference.

His prior legal and compliance experience includes:

- Global Head of Anti-Money Laundering: American Express Company
- Senior Vice President, Risk Management & Investigations: Charles Schwab & Co.
- Senior Vice President, AML, OFAC, International and FCPA Compliance: Smith Barney
- Deputy Commissioner/General Counsel: NYC Commission for the UN and Consular Corps
- Second Vice President and Associate Counsel: The Chase Manhattan Bank, N.A.
- Corporate Attorney: Skadden, Arps, Slate, Meagher & Flom

Mr. Koch received his *Juris Doctor* degree from the New York University School of Law, and his Bachelor of Arts degree *magna cum laude* from the University at Albany. He has studied in Copenhagen, Cambridge and Warsaw.  He wrote the screenplay for *Money Laundering: A Global Menace*, the anti-money laundering training video used widely in the financial services industry.  A licensed pilot and motorcycle enthusiast, he is married and has three sons.